UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60345-RUIZ/STRAUSS

SCOTLAND CAY, LLC,

     Plaintiff,

v.

AMERICAN RELIABLE INSURANCE
COMPANY,

     Defendant.

_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment (DE 21; DE 23) and Plaintiff's Motion for Summary Judgment (DE 31) (the "Cross-Motions for Summary Judgment"), and Defendant's Motion to Reopen Discovery (DE 47) (collectively, the "Motions"). The Honorable Rodolfo A. Ruiz II, United States District Judge, referred the Motions to me to take all action as required by law pursuant to 28 U.S.C. § 636(b)(1)(A) and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida. (DE 51). I have carefully reviewed the Motions, the responses (DE 41; DE 42; DE 49), the replies (DE 48; DE 50), and the record. Being otherwise duly advised, I respectfully **RECOMMEND** that the Cross-Motions for Summary Judgment and Defendant's Motion to Reopen Discovery be **DENIED** for the reasons stated herein.

I.     **BACKGROUND**

    A. **Procedural History**

Plaintiff filed a one-count Complaint on February 15, 2020 alleging breach of an insurance contract following Defendant's denial of its claim for losses sustained when Plaintiff's yacht, a

2002 65' Viking (the "Vessel"), struck an underwater object returning to Fort Lauderdale from the Bahamas on November 3, 2019, took on water, and sank by the next morning.  (DE 1).  On May 19, 2020, Defendant filed its Answer and Counterclaim in which Defendant pled three (3) counterclaims seeking Declaratory Judgment regarding the insurance policy's coverage on grounds that: (1) Plaintiff breached the terms of the insurance policy by misrepresenting or failing to disclose facts material to Defendant's decision to accept the risk of insuring the Vessel, including failing to disclose that Plaintiff intended to use the Vessel for occasional chartering; (2) Plaintiff misrepresented or failed to disclose that the Vessel was intended to be used for commercial purposes; and (3) Plaintiff was using the Vessel for commercial purposes when the Vessel sustained damage, thus suspending coverage under the terms of the policy.  (DE 5 at ¶¶19-20; 29-30; 39).  On August 28, 2020, Defendant voluntarily dismissed its third counterclaim that alleged the Vessel sustained damage while in commercial use.  (DE 18).

On June 3, 2020, the District Court entered its Scheduling Order setting a jury trial to begin on March 29, 2021, setting a discovery deadline of December 1, 2020, and setting other pretrial deadlines.  (DE 10).  The parties proceeded to conduct discovery without dispute through the filing of their Cross-Motions for Summary Judgment.  Defendant filed its motion for summary judgment on December 7, 2020, and Plaintiff filed its motion for summary judgment on December 15, 2020.  (DE 21 and DE 23; DE 31).  On December 21, 2020, the District Court suspended all remaining deadlines in the case and indicated that a revised scheduling order would be entered if necessary, following a ruling on the Cross-Motions for Summary Judgment.  (DE 39).

On January 5, 2021, Defendant filed a motion requesting a status conference, alleging that Defendant had continued investigating the facts and surfaced a great deal of new information bearing directly on Plaintiff's denial of chartering the Vessel.  (DE 45).  The District Court denied

Defendant's motion requesting a status conference on January 6, 2021.  (DE 46).  The Court's order directed Defendant to file an appropriate motion and engage in meet and confer requirements to reach an agreement regarding the late discovery of new information and documents allegedly material to the Cross-Motions for Summary Judgment.  *Id*.  The Court also instructed that "Defendant must establish good cause for reopening discovery at this late stage in the proceedings and explain how the new information and documents uncovered by Defendant will impact the Court's ruling on the parties' motions for summary judgment." *Id.*  Defendant then filed its motion to reopen discovery on January 12, 2021.  (DE 47).

### B.  Facts[1]

In May 2016, Mr. Thomas Turley ("Mr. Turley") purchased the Vessel, which was known as the "Grecian Gal," and formed Plaintiff to take title to it at the advice of his counsel.  (DE 30 at ¶2; DE 43 at ¶2).  Mr. Turley is the sole owner of Plaintiff.  (DE 22 at ¶4; DE 40 at ¶4; DE 27-1 at 5:1-10; 39:11-40:1).  Defendant's representative concedes that corporate ownership of a vessel of this size and value is customary.  (DE 30 at ¶3; DE 43 at ¶3; DE 40 at ¶30; DE 44 at ¶30).  Although Mr. Turley's primary reason for purchasing the Vessel was for use on trips to the Bahamas, he conceded at his deposition that he was also interested in exploring the possibility of chartering it.  (DE 22 at ¶1; DE 40 at ¶1).

The Vessel struck an underwater object on November 3, 2019,[2] returning from a humanitarian mission in The Bahamas and sunk while tied-up at her dock.  (DE 30 at ¶24; DE 43

---

[1] These facts are taken from the parties' statements of facts ("SOFs") and responses thereto for consideration in adjudicating the parties Motions for Summary Judgment.  They do not incorporate the alleged new facts described in Defendant's Motion to Re-Open Discovery.

[2] Plaintiff states the date as November 3, 2020, but the correct date is November 3, 2019.  *See* DE 1 at ¶ 8.

at ¶24).   The loss would be covered except for Defendant's argument that Mr. Turley misrepresented and/or failed to disclose for insurance the intent to use the vessel for precluded chartering or commercial purposes.  (DE 30 at ¶24; DE 43 at ¶24; DE 40 at ¶43; DE 44 at ¶43). The Vessel was rendered a constructive loss as a result of striking the underwater object and sinking as detailed above, which requires payment under the policy of $440,000.  (DE 30 at ¶25; DE 43 at ¶25).   Expenses incurred to raise and tow the Vessel, in the amount of $36,599.28, constitute "wreck" removal and are payable under the policy.  (DE 30 at ¶26; DE 43 at ¶26). Because the policy required action to raise, protect, and mitigate damages to the Vessel, additional costs of $37,707.12 were "incurred at Broward" [sic].[3]  (DE 30 at ¶27; DE 43 at ¶27).  Following denial of coverage on February 21, 2020, the Vessel was towed to Marina Road Marina, with additional costs incurred of $6,978.18.  (DE 30 at ¶27; DE 43 at ¶27).

Mr. Turley applied for his first insurance policy on the Vessel in May 2016.  (DE 30 at ¶4; DE 43 at ¶4).  A true and correct copy of the application to National Specialty Insurance Company ("NSIC") is attached to Defendant's SOF.  (DE 22 at ¶5; DE 40 at ¶5; DE 22-2).  The application identifies a charter endorsement as TWCHRTER* 3/1/2015 ("NSIC Charter Endorsement"). (DE 22-2 at 3).  The application was used by brokers representing Mr. Turley to obtain the NSIC policy.  (DE 22 at ¶5; DE 40 at ¶5).  On the application, Mr. Turley answered "no" to the question: "Is vessel used for Commercial Fishing or Charter Activities?."  (DE 30 at ¶4; DE 43 at ¶4; DE 40 at ¶31; DE 44 at ¶31).  Notwithstanding his "no" answer, Mr. Turley asked the insurance agent for charter coverage.  (DE 22 at ¶7; DE 40 at ¶7).  The "no" answer was a correct answer because the vessel was not being used for these activities even though the coverage included an endorsement for occasional passenger charter pursuant to the "COVERAGE" section of the application and the

---

[3] Plaintiff appears to mean Bradford Marine, where the Vessel was brought pending Defendant's determination of coverage for the loss.  (DE 30 at ¶27; DE 43 at ¶27).

description of coverage.  (DE 30 at ¶4; DE 43 at ¶4; DE 22-2; DE 40 at ¶31; DE 44 at ¶31).  Mr. Turley testified that he asked for the coverage with respect to chartering on the 2016 application in case he later decided to charter; however, he testified that he never did charter.  (DE 22 at ¶18; DE 40 at ¶18).

After submission of the insurance application, Mr. Turley was advised that coverage had been bound but that charter coverage had been removed subject to being added back upon the submission of information for a captain to be hired at a later date.  (DE 30 at ¶5; DE 43 at ¶5; DE 40 at ¶32; DE 44 at ¶32).  Mr. Turley sent an email on July 7, 2016 to the insurance representative attaching the resume of the captain that he had hired.  (DE 30 at ¶5; DE 43 at ¶5; DE 27 at 45:16-46:5, 47:13-48:18; DE 40 at ¶32; DE 44 at ¶32).  Following the submission of the information regarding the captain, Mr. Turley believed he had coverage to occasionally charter the vessel.[4]  (DE 30 at ¶6; DE 43 at ¶6; DE 27 at 102:18-22).

From May of 2016 until May of 2019, Plaintiff insured the Vessel with NSIC.  (DE 22 at

---

[4] Defendant admits the whole of ¶6 of Plaintiff's SOF, which includes a statement that "[Mr. Turley] did not charter the vessel in 2016, nor in 2017 . . . nor in 2018."  (DE 30 at ¶6; DE 43 at ¶6).  This admission, however, conflicts with Defendant's denial of Plaintiff's statement in ¶8 alleging that Mr. Turley only used the Vessel for personal pleasure or business entertainment when traveling to Ft. Lauderdale.  (DE 43 at ¶8).  Defendant alleges in its denial of ¶8 that Mr. Turley regularly employed a professional yacht captain and reported income on his tax returns confirming that the Vessel was employed for commercial purposes.  Defendant also denied, for the same reason, Plaintiff's statements that Mr. Turley has never been in the business of yacht charters or other yacht-related commercial enterprise.  (DE 30 at ¶1; DE 43 at ¶1; DE 40 at ¶29; DE 44 at ¶29).  Further, Defendant denied, in response to Plaintiff's additional SOF, the statement that the Vessel was not chartered from 2016-2018 based on the fact that Mr. Turley's tax returns reflected substantial income from the use of the Vessel as a "Charter Boat."  (DE 40 at ¶33; DE 44 at ¶33; *see also* Defendant's denial of Plaintiff's similar, additional SOF – DE 40 at ¶35; DE 44 at ¶35).  Because the record contains conflicting statements as to whether Mr. Turley chartered the vessel in 2016-2018, despite Defendant's carelessness in admitting in ¶6 that the Vessel was never chartered by Mr. Turley in 2016-2018, I find that the issue of whether Mr. Turley actually chartered the Vessel during this timeframe is disputed.  This footnote is referenced *infra* as **Defendant's Denial of Plaintiff's SOF regarding use of the Vessel**.

¶5; DE 40 at ¶5).  Mr. Turley never completed any other applications or renewal questionnaires for the NSIC policies issued for 2017-18 and 2018-19.  (DE 22 at ¶8; DE 40 at ¶8).  During the entire three years that NSIC insured the Vessel, Mr. Turley believed he had requested, and had, coverage for occasional chartering.  (DE 22 at ¶¶7, 18; DE 40 at ¶¶7, 18).  Attached to Defendant's SOF are true and correct copies of the declarations pages for the three NSIC policies that provided coverage for the Vessel from May of 2016 until May of 2019.  (DE 22 at ¶10; DE 40 at ¶10; DE 22-3).  The declaration pages for 2016-17, 2017-18, and 2018-19 reflect an absence of the NSIC Charter Endorsement in the sections listing endorsements.  (DE 22-3 at 2-4).

Plaintiff acknowledged the existence of an on-line advertisement for charter of the Vessel, except for the authenticity of the document.  (DE 22 at ¶2; DE 40 at ¶2; DE 22-1).  A copy of the advertisement, attached to Defendant's SOF, reflects that it is titled "Grecian Gal – Crewed Motor Yacht Charter," is dated as having been printed on November 15, 2019, and reflects that the Vessel is available for charter for $20,520 per week.  (DE 22 at ¶2; DE 40 at ¶2; DE 22-1).  Mr. Turley admits that he spoke with charter companies but testified that he did not instruct any of the charter companies to list the Vessel for charter.  (DE 22 at ¶3; DE 40 at ¶3).  In fact, Mr. Turley denies any knowledge about advertising of the Vessel.  (DE 22 at ¶2; DE 40 at ¶2).  Despite Defendant's agent, Nautilus Investigations, carrying out a thorough investigation, Defendant's corporate representative could not confirm that Turley, in fact, advertised or held the Vessel out for charter.[5]

---

[5] Defendant's SOF states that Mr. Turley "denies" knowing about or taking any action with respect to advertising the Vessel for charter (DE 22 at ¶2).  Defendant twice admits, however, based upon Mr. Turley's deposition testimony, that Mr. Turley never engaged any company's services to advertise the Vessel for charter.  (DE 30 at ¶7; DE 43 at ¶7; DE 40 at ¶34; DE 44 at ¶34).  Yet, in its motion for summary judgment, Defendant states: "Perhaps it is merely a coincidence that Mr. Turley's vessel was advertised on the Internet as being available for charter beginning in December of 2016, and he denies having any knowledge with regard to the placing or the advertising[of] his vessel for charter."  (DE 23 at 2).  Indeed, one could reasonably infer that the ad would not be placed and active without the owner's knowledge.  In addition, Plaintiff acknowledges the advertising, and its motion for summary judgment states, with respect to the advertising, this: "If

(DE 30 at ¶7; DE 43 at ¶7; DE 40 at ¶34; DE 44 at¶34).

In April 2019, Ms. Nicole Favita at Oversea Insurance Agency ("Oversea"), notified Mr. Turley that his renewal coverage had to be placed elsewhere.  (DE 30 at ¶10; DE 43 at ¶10; DE 22 at ¶11; DE 40 at ¶11).  Mr. Turley received a recommendation that he apply for insurance with Defendant.  (DE 30 at ¶10; DE 43 at ¶10).  A true and correct copy of the Quote Summary that Oversea submitted to Mr. Kenneth Ferch, Defendant's underwriter who made the determination as to the risk and premium for issuing Defendant's policy for the Vessel, is attached to Defendant's SOF.  (DE 22 at ¶21; DE 40 at ¶21; DE 22-9).  Oversea sought a quote from Mr. Ferch for the policy that Mr. Turley hoped to obtain from Defendant.  (DE 22 at ¶22; DE 40 at ¶22).

In corresponding with Mr. Turley, Ms. Favita asked Mr. Turley, in an email dated April 1, 2019, a true and correct copy of which is attached to Defendant's SOF, whether any changes were needed to his coverage and whether he still employed a full-time captain and a full-time crew.  (DE 22 at ¶11; DE 40 at ¶11; DE 22-4).  Mr. Turley responded to Ms. Favita by email, on April 3, 2019, and stated that there would be no changes for the coming year's policy and asked for a copy of last year's policy "so [he could] review the terms again."  (DE 22 at ¶12; DE 40 at ¶12).  Mr. Turley testified that he did not know how, where, or why Ms. Favita believed that he was

---

there is any evidentiary value to these web sites, it may only be proof that anyone, anywhere, anytime, can post positively preposterous misinformation."  (DE 31 at 9).  Accordingly, based on the parties' SOF, the responses thereto and the Cross-Motions for Summary Judgment, I conclude that there is a dispute as to Mr. Turley's knowledge of the Vessel being advertised for sale, and a dispute regarding his involvement with such advertising.

While unnecessary to conclude that a material fact regarding the Vessel's advertising is in dispute, I observe that, in its Motion to Reopen Discovery, Defendant put into the record evidence that, at least facially, indicates that Mr. Turley was involved in engaging a company to list and advertise the Vessel for charter.  (DE 47-2 at 26:8-10; 26:22-27:1; 47-3 at 25).  In particular, an email from hillary@yachtlife.com that is copied to Mr. Turley discusses chartering of the Vessel and states: "We have had several interests and requests from our listing on Central Yacht Agency as well as Yachtlife platforms."

employing either a captain or a crew.  (DE 22 at ¶13; DE 40 at ¶13).  Mr. Turley also testified that he did not have a full-time captain nor a full-time crew for the 2018-19 policy year.  (DE 22 at ¶13; DE 40 at ¶13).

On April 4, 2019, Ms. Favita again emailed Mr. Turley with the question: "Just to confirm, do you employ a full-time captain and crew or just part-time?"  (DE 22 at ¶14; DE 40 at ¶14).  Mr. Turley responded by email, on April 23, 2019, stating: "Sorry, I realized I did not respond to this email.  We have a part-time captain who also oversees my maintenance."  (DE 22 at ¶15; DE 40 at ¶15).

The application is a part of Defendant's insurance policy.  (DE 30 at ¶13; DE 43 at ¶13).  Mr. Turley signed the application on May 21, 2019, a true and correct copy of which is attached to Defendant's SOF.  (DE 22 at ¶¶16-17; DE 40 at ¶¶16-17; DE 22-8).  The application included a subsection titled "Optional Physical Damage Coverages (not available on P&I only)" with a phrase following it that stated: "Captained Occasional or Occasional Charter Coverage."  (DE 30 at ¶11; DE 43 at ¶11).  Mr. Turley answered "no" to wanting this coverage.  (DE 22 at ¶¶16-17; DE 40 at ¶¶16-17; DE 22-8).  When asked why he answered "no," Mr. Turley testified that "[t]he insurance agent filled out [the] form," Mr. Turley relied on the agent's expertise and professionalism, and, when he reviews insurance information, "the primary thing [he] look[s] for is deductible, premium and one or two of the economic factors."  (DE 22 at ¶19; DE 40 at ¶19).  Additionally, Mr. Turley "admitted that he didn't want this additional coverage" because, at that time, he had no intention of chartering the vessel, occasionally or otherwise.[6]  (DE 30 at ¶11; DE

---

[6] Defendant admitted the statement in Plaintiff's SOF that "no" was a correct answer to the question regarding the additional coverage but denied the same statement in Plaintiff's additional SOF.  (DE 30 at ¶11; DE 43 at ¶11; DE 40 at ¶37; DE 44 at ¶37).  Thus, the record is insufficient to conclude that the truth of Plaintiff's answer is uncontested.

43 at ¶11).  Mr. Turley also attested and warranted in the signed application that the Vessel "is not

used *primarily* for commercial purposes."[7] (emphasis added) (DE 30 at ¶12; DE 43 at ¶12).  In his

deposition, Mr. Turley testified that he believed he had charter coverage when Defendant issued

the policy in May 2019.  (DE 22 at ¶¶19-20; DE 40 at ¶¶19-20).

      Defendant's underwriter, Mr. Kenneth Ferch, who made the determination regarding

issuing the policy, stated that "primarily" means "mostly" and not "exclusively."  Therefore, the

vessel was permitted to be used on occasion for "commercial purposes."  (DE 30 at ¶14; DE 43 at

¶14).  Neither Defendant's policy, nor the application, defines "commercial purposes," and the

policy states: "Recreational entertaining of the insured's clients on the [Vessel] is not considered

commercial use."  (DE 30 at ¶15; DE 43 at ¶15).  Mr. Ferch testified that business entertainment

use of the Vessel is a permitted use under the policy; and, for purposes of underwriting, having

business associates and clients contribute to covering costs of using the Vessel would be permitted.

(DE 30 at ¶16; DE 43 at ¶16; DE 40 at ¶38; DE 44 at ¶38).

      Mr. Ferch further testified that had "Captained Occasional or Occasional Charter

Coverage" been checked "yes" on the application, he would have questioned the kind of

"chartering" and the prior use of the Vessel because the Vessel was not a traditional charter fishing

vessel.  (DE 30 at ¶17; DE 43 at ¶17; DE 40 at ¶39; DE 44 at ¶39).  At the time of underwriting

the Vessel, Defendant only provided occasional charter coverage for what is known as a "six-

pack," or boats taking out no more than six persons on fishing charters.  (DE 30 at ¶17; DE 43 at

¶17; DE 40 at ¶39; DE 44 at ¶39).  Mr. Ferch testified that, if the Vessel was not the typical six-

---

[7] Despite Defendant admitting the entirety of ¶12, including that Mr. Turley's statement was correct that the Vessel "is not used primarily for commercial purposes," because of conflicting statements in the record, I find that the issue of whether Mr. Turley actually used the Vessel primarily for commercial purposes is disputed.  *See* **Defendant's Denial of Plaintiff's SOF regarding use of the vessel** *supra*.

pack, he would have had Mr. Turley sign a statement that he would not use the vessel for "charters"; and, if Mr. Turley refused to sign the statement, Mr. Ferch would not have agreed to insure the Vessel.  (DE 30 at ¶18; DE 43 at ¶18; DE 40 at ¶40; DE 44 at ¶40).  Defendant stated under oath in answers to interrogatories that, upon knowing Plaintiff intended to occasionally charter, it would have insisted on receiving a statement that the prior situation had changed and that the Vessel would no longer be chartered or used for commercial purposes.  (DE 30 at ¶20; DE 43 at ¶20; DE 40 at ¶42; DE 44 at ¶42).   Otherwise, Defendant answered that the underwriter would have rejected the risk.  (DE 30 at ¶20; DE 43 at ¶20; DE 40 at ¶42; DE 44 at ¶42).

If Mr. Turley did sign the statement that he would not use the vessel for charters, Mr. Ferch would have agreed to issue the policy.  (DE 30 at ¶18; DE 43 at ¶18; DE 40 at ¶40; DE 44 at ¶40). Also, if Mr. Turley signed such a statement, Mr. Ferch would have made no further inquiry and would not have asked Mr. Turley to produce income tax returns or previous policies.  (DE 30 at ¶19; DE 43 at ¶19; DE 40 at ¶41; DE 44 at ¶41).  Even if Mr. Ferch had reviewed the tax returns, he would have followed the same procedure involving getting a signed statement that the Vessel would not be used for charter moving forward.  (DE 30 at ¶21; DE 43 at ¶21).  Defendant acknowledged it could not know Mr. Turley's intent "since they are not a mind reader."  (DE 30 at ¶22; DE 43 at ¶22; DE 40 at ¶43; DE 44 at ¶43).

Mr. Ferch also testified that, if he had possession of Plaintiff's prior insurance policy, the application for that policy, *and* the 2016, 2017, and 2018 tax returns, reflecting that the Vessel was being chartered when Mr. Turley stated that he was not going to charter the Vessel, it would have presented a veracity problem.  (DE 22 at ¶27; DE 40 at ¶27).  Mr. Ferch testified that such a veracity issue would likely have resulted in declining to issue a policy to cover the Vessel regardless of Mr. Turley's willingness to provide a statement that he would not charter in the

future.  (DE 22 at ¶27; DE 40 at ¶27).  Mr. Ferch also testified that, if he had agreed to insure the Vessel for occasional chartering, there would have been an endorsement and a higher premium.[8] (DE 22 at ¶27; DE 22 at¶40).

Mr. Turley's 2016, 2017, and 2018 tax returns each show that Mr. Turley described the vessel as a "CHARTER BOAT" and show that he declared income from his commercial use of the vessel in these three years prior to his submission of the May 21, 2019[9] insurance application. (DE 22 at ¶¶22-26; DE 40 at ¶¶22-26).  Per the advice of Mr. Turley's certified public accountant, he reported on his tax return the monies he allegedly received from business partners and associates to cover costs for use of the Vessel for entertainment.  (DE 30 at ¶9; DE 43 at ¶9).  Mr. Turley's 2019 state and federal income tax returns did not make any reference to Plaintiff or the Vessel because he did not receive income or payments of any type for the Vessel; the need to use the Vessel for business entertainment no longer existed.  (DE 30 at ¶23; DE 43 at ¶23; DE 40 at ¶45; DE 44 at ¶45).

Defendant's insurance policy states, in pertinent part:

INSURING AGREEMENT

*****

By accepting this policy, you agree that the statements on the Declarations Page and any applications are your agreements and representations. This policy is issued in reliance upon the truth of your representations during the application process and it includes all agreements existing between you and us or any of our representatives.

*****

DEFINITIONS

---

[8] Plaintiff acknowledges that Mr. Ferch provided this testimony regarding veracity and charging additional premium but contends that it is inconsistent with the testimony above; whereas, Defendant disputes that this testimony is inconsistent.  (DE 22 at ¶27; DE 40 at ¶27; DE 40 at ¶42; DE 44 at ¶42).

[9] The date is stated and admitted to be May 11, 2019; however, the correct date is May 21, 2019. *See* DE 22 at ¶16; DE 40 at ¶16; DE 22-8 at 5.

*****

3.      Business means:
   a.      Any full-time or part-time trade;
   b.      Profession;
   c.      Occupation engaged in for economic gain;
   d.      Chartering; or
   e.      Sharing of the vessel for money, ie. peer-to-peer
           transactions for compensation.

### GENERAL CONDITIONS AND EXCLUSIONS

1.  Use of the insured yacht

If you violate and [sic] of the following conditions, coverage will be suspended until you are no longer in violation;

a.  The insured yacht is for private pleasure use only. Coverage is not provided for charter, hire, lease or any other commercial or business use including but not limited to peer-to-peer transactions. Recreational entertaining of the insured's clients on the insured yacht is not considered commercial use.

*****

3.      Concealment, Misrepresentation or Fraud
All insurance provided by this policy will be null and void if you, before, during, or after a loss, either intentionally conceal or misrepresent any fact, regardless of materiality, or if you misrepresent or conceal any material fact regardless of intent. No action or inaction by us will be deemed a waiver of this provision.

(DE 22 at ¶28; DE 40 at ¶28).

### C.  <u>The Cross-Motions for Summary Judgment</u>

Plaintiff's motion for summary judgment argues that the issues are: (1) whether Plaintiff misrepresented or failed to disclose in the application for insurance the *intent to use* the Vessel for occasional charter and/or commercial purposes; and (2) whether, if so, Defendant would have refused to issue the insurance policy.  (DE 31 at 3-4) (emphasis in original).  Defendant's motion for summary judgment posits that the critical issue in this case is whether Plaintiff misrepresented

or failed to disclose facts material to its decision to issue insurance.  (DE 21 at ¶1).

### D.  **Defendant's Motion to Reopen Discovery**

Defendant's Motion to Reopen Discovery alleges that Mr. Thomas Turley engaged in chartering of the Vessel, even during the term of the Defendant's policy, contrary to his sworn testimony, including testimony taken in his deposition of November 24, 2020.  (DE 47 at 1). Defendant seeks the opportunity to depose at least three (3) witnesses "who have relevant knowledge of the facts and circumstances bearing directly on the issue of coverage" under the policy.  *Id.* at 1-2.  In support of its motion, Defendant attaches: (1) a signed statement from Mr. John Jones, whom Plaintiff disclosed to Defendant in the application for insurance as Plaintiff's regularly employed captain; (2) a formal recorded statement from Mr. Steve Palazzo, whom Defendant alleges that Plaintiff only disclosed in its Rule 26 disclosures as a captain in connection with vessel maintenance; and (3) thirty (30) emails from Mr. Palazzo, which were never produced or referenced by Mr. Turley.  (DE 47 at ¶¶2-4).

Mr. Jones' statement, which he provided on January 7, 2021 stated, *inter alia*, that he worked part-time for "brothers Thomas Turley and Matt Turley" from December 2018 to June 2019.  *Id.*  Mr. Jones asserted that "[w]hen [he] first met the Turleys they told [him] that they were trying to make money by chartering the [Vessel]."  *Id.*  Mr. Jones also reported that he "took charter groups on the [Vessel] on three different occasions for the Turleys . . . and [was] paid afterwards by the Turleys by cash."  Mr. Jones further stated that soon after he started working for the Turleys, "Matt Turley [emailed him] that they were going to put the boat in charter with Yacht Life."  *Id.*

Mr. Palazzo provided a witnessed and recorded statement, dated December 26, 2020, wherein he also contended that the Turleys "bought the boat with the idea that they were going to charter it and it was going to be a business and would make money."  (DE 47-2 at 4:3-4; 12:2-8,

15-17).  Mr. Palazzo stated that he had his first meeting with the Turleys on August 23, 2018.  *Id.* at 8:14-25.  He stated that he had "a lot of communication," including emails, with the Turleys about what they needed to do in order to legally charter the Vessel.  *Id.* at 18:17-20:3.  In addition, Mr. Palazzo reported that the Turleys had contacted a Ms. Hillary Davis at Yacht Life to manage "the charter end of things."  *Id.* at 22:1-25.  According to Mr. Palazzo, he interacted with Ms. Davis to acquire her support in impressing upon the Turleys, among other things, the need for certain furnishings and equipment for chartering.  *Id.* at 23:16-24-5.  Mr. Palazzo explained that issues with getting the Turleys to pay for improvements caused the relationship to end and that he only ever ran the boat "for the Turleys themselves and their friends" for lunch and dinner cruises.  *Id.* at 13:5-14:16; 29:7-12.  When told, however, that the Turleys denied having anything to do with chartering their Vessel, Mr. Palazzo responded that the denial was "about as far from the truth as it can be.  It was all about chartering the vessel."  *Id.* at 32:1-7.

The emails, which Mr. Palazzo provided, support his recorded statement.  As one example, the following email acknowledges that the Vessel[10] was being used for charters in 2018:

---

[10] Grecian Gal was the name of the Vessel when Plaintiff purchased it, and Mr. Turley did not change the name as it appeared on the Vessel although he changed the name on the title to Micheline.  (DE 27-1 at 33:3-11).

-----Original Message-----
From: Matt <maturley@comcast.net>
To: Steve Palazzo <palazzomarine@aol.com>; Stuart Dodd <Stu4boats@bellsouth.net>; Christopher Arnold <cw_arnold@ymail.com>
Cc: Tom Turley <tom.turley@am.jll.com>
Sent: Thu, Oct 11, 2018 12:53 pm
Subject: Charters soon

Guys, we are getting requests for more charters on the Grecian Gal in the coming weeks. Meanwhile y'all have been sending me miscellaneous observations about things that you have addressed or that require attention. I will be offline for several days. Please work on the following this week so that we can align on priorities next week. thanks!
1.    Send me organized lists of things that you have addressed recently.
2.    Tell me of any other issues that need to be tracked and addressed, and if you would be the one to address them.
3.    Identify any urgent issues that should or must be completed before any more charters.
Matt Turley
415-786-6687
maturley@comcast.net

(DE 47-3 at 11).  Thus, Defendant requests that the Court reopen discovery for the limited purpose of deposing Mr. Jones, Mr. Palazzo and Ms. Davis.  (DE 47 at 7).

Plaintiff's counsel "readily acknowledges that the information attached to the Motion facially is at odds with Turley's testimony regarding chartering and also his intent to charter prior to the inception of the [insurance] policy."  (DE 49 at n.1).  Nonetheless, Plaintiff objects to reopening discovery and argues that the information was known to, and discoverable by, Defendant from the beginning of the case and only reinforces other information that Defendant relies upon, which is already in the record.  *Id.*  Further, Plaintiff argues that there is no reason for information to cast further doubt on Turley's intention to charter at the time of application for insurance because Defendant already offered evidence through Mr. Turley's tax returns and admitted "belief" that he had a right to charter.  *Id.* at 10.  Plaintiff argues that Mr. Turley's repeated denials with respect to his intent to charter and his explanation of the tax returns may create an issue of fact, but the fact is immaterial because Defendant would have issued the policy anyway without change.  *Id.*  In sum, Plaintiff argues that there is no legal basis to reopen discovery because Defendant was not diligent in pursuing evidence to establish its case; and, in any event, the new

15

information does not impact the pending Cross-Motions for Summary Judgment.  *Id.*

In particular, Plaintiff attaches to its response a November 21, 2019 investigative Summary of Findings of Chartering Advertisement that identifies Captain Steve Palazzo a/k/a Stephen A. Palazzo as being listed with yacht vacation brokers who advised that the Vessel was posted in the "National Database" for charter in 2019.  (DE 49-1 at 2-3).

## II.   LEGAL STANDARDS

### A.  Motion to Reopen Discovery

"A party seeking the extension of an already-expired scheduling order deadline must show both good cause and excusable neglect."  *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 944 (11th Cir. 2015) (citing Fed. R. Civ. P. 6(b)(1), 16(b)(4)).  "Th[e] good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'"  *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (citing Fed. R. Civ. P. 16 advisory committee's notes and *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) for the proposition that, "[i]f a party was not diligent, the good cause inquiry should end").  "In determining whether a party has shown 'excusable neglect' warranting an extension, a court must consider all pertinent circumstances, including 'the danger of prejudice to the nonmovant, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'"  *Payne*, 606 F. App'x at 944 (quoting *Advanced Estimating Sys. v. Riney*, 77 F.3d 1322, 1325 (11th Cir.1996)).

### B.  Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In other words, where a reasonable finder of fact could "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23).  *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)).  Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists.  *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270,

17

1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"However, a mere scintilla of evidence in support of the non-moving party's position is insufficient

to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381

F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242).   Nevertheless, courts "must

view all the evidence and all factual inferences reasonably drawn from the evidence in the light

most favorable to the nonmoving party."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117

F.3d 1278, 1285 (11th Cir. 1997) (citation omitted).   Moreover, all reasonable doubts regarding

the facts must be resolved in favor of the non-moving party.  *Rioux v. City of Atlanta, Ga.*, 520

F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

Where the determination of insurance coverage depends upon the legal effect of the

provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court

to determine and is, therefore, amenable to summary judgment.  *Gulf Tampa Drydock Co. v. Great

Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir.1985).   "Summary judgment is appropriate in

declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any,

rests solely on the applicability of the insurance policy, the construction and effect of which is a

matter of law."  *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1358 (M.D. Fla. 2001).

"The policy, however, must contain clear and unambiguous wording to resolve the issue as a matter

of law."  *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Vinardell Power Sys., Inc.*, No. 19-20093-

CIV, 2020 WL 1307192, at *3 (S.D. Fla. Mar. 19, 2020) (internal quotation marks and citation

omitted).

### C.  **Marine Insurance**

The general rule of marine insurance is a clear and well-settled rule of maritime law that

requires full disclosure.  *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984),

*on reh'g*, 779 F.2d 1485 (11th Cir. 1986). The doctrine of *uberrimae fidei* – utmost good faith –

applies to those entering into marine insurance contracts because the underwriter typically has no

practical means of verifying the accuracy of the facts furnished by the prospective insured before

accepting the risk. *Id.* (citation omitted).

> Nothing is better established in the law of marine insurance than that a mistake or
> commission material to a marine risk, whether it be [willful] or accidental, or result
> from mistake, negligence or voluntary ignorance, avoids the policy, and the same
> rule obtains, even though the insured did not suppose the fact to be material.
> "Concealment," in the law of marine insurance, is the failure to disclose any
> material fact or circumstance in relation to the subject matter of the contract which
> may increase the liability to loss, or affect the risk or obligation assumed, and which
> is, in fact or law, within or ought to be within, the knowledge of one party, and of
> which the other party has no actual or presumptive knowledge. In the case of marine
> insurance[,] the insured must disclose all facts material to the risk, and in default of
> such duty the contract may be avoided by the insurer. In other words, an applicant
> for marine insurance must state all material facts which are known to him and
> unknown to the insurer. It has been said that the insured is bound to communicate
> every material fact within his knowledge not known or presumed to be known to the
> underwriter, whether inquired for or not; and that a failure in either particular,
> although it may arise from mistake, accident, or forgetfulness, is attended with the
> rigorous consequences that the policy never attaches and is void, for the reason that
> the risk assumed is not the one intended to be assumed by the parties.

*Id.* (internal quotation marks and citations omitted).

## III.    ANALYSIS

Here, the record does not support that Defendant was diligent in pursuing discovery to

justify reopening discovery. In addition, the record does not support summary judgment for either

party. I discuss each of these matters in turn.

### A.    Motion to Reopen Discovery

Here, Plaintiff is correct that Defendant fails to demonstrate good cause to reopen

discovery. The record demonstrates that Plaintiff was, or should have been, aware of the

individuals it now seeks to depose for a considerable period of time. Defendant acknowledges that

Plaintiff disclosed Mr. Jones to Defendant in the application for insurance. Even though the "new

information" indicates that Mr. Jones' role with respect to the Vessel was different than what was disclosed in the application, Defendant is not excused from verifying for itself that information before discovery closed.  In addition, Defendant knew of Mr. Palazzo for more than one year prior to the December 1, 2020 discovery deadline, yet only obtained Mr. Palazzo's statement after discovery ended.

Furthermore, it appears at least facially that, from the statement and emails that Mr. Palazzo recently provided to Defendant, Mr. Palazzo interacted with Ms. Davis at Yacht Life about readying the Vessel for charter.  Therefore, if Defendant had been diligent by earlier investigating Mr. Palazzo's role with respect to the Vessel, it should have been able to discover the need to depose Ms. Davis at Yacht Life well before the end of discovery.  Moreover, the Summary of Findings of Chartering Advertisement, dated November 21, 2019 and prepared by Defendant's investigator, includes a statement: "Nothing has been found as of yet regarding 'Yacht Life' management company.  Efforts are still ongoing."  (DE 49-2 at 3).  Thus, Defendant was aware of Yacht Life at least one year prior to the close of discovery but failed to surface any information about Yacht Life's role in assisting Mr. Turley with chartering of the Vessel.  Also, Plaintiff attached Defendant's Examination Under Oath ("EUO") on January 3, 2020 to its response to the Motion to Reopen where Defendant does not question Mr. Turley about Mr. Palazzo, nor about Ms. Davis, nor about Yacht Life despite prior awareness of these individuals and the Yacht Life entity.  (DE 49-3).  The EUO does evidence, however, that Defendant was aware, on January 3, 2020, that Mr. Jones was listed as captain of the Vessel and as the person responsible for the Vessel in Mr. Turley's absence for purposes of Defendant's insurance policy.  (DE 49-3 at 65:23-67:2). Yet, Defendant did not obtain a statement from Mr. Jones until January 7, 2021, well after the discovery period ended on December 1, 2020 and more than one year following Mr. Turley's EUO.

Accordingly, I find that Defendant was not diligent in pursuing discovery and that good cause does not exist to reopen discovery. The good cause inquiry ends when a party is not diligent. *Sosa*, 133 F.3d at 1418.

In addition to lack of good cause for re-opening discovery, I note that Defendant fails to explain, as ordered by the Court (DE 46), how the newly discovered evidence would impact the Court's ruling on the Cross-Motions for Summary Judgment. Indeed, as explained below, I find that genuine issues of material fact exist, requiring denial of both of the Cross-Motions for Summary Judgment, regardless of whether the newly discovered evidence is considered or not. Neither party should misinterpret this finding as a suggestion that the newly discovered evidence is irrelevant or unimportant. The facts alleged in Defendant's Motion to Re-Open Discovery, if proven true, potentially corroborate other facts already in the record suggesting that Mr. Turley did charter the Vessel before, and intended to continue chartering the Vessel after, applying for the relevant insurance policy. Even more seriously, the alleged new facts, if credited, could significantly undermine Mr. Turley's credibility and contradict his deposition testimony. I do not take lightly the Defendant's suggestion that Mr. Turley may have deliberately lied at his deposition. *See* DE 47 at ¶ 9. And Defendant should have an opportunity to present testimony and other evidence from Mr. Jones, Mr. Palazzo, and Ms. Davis at trial. However, the potential importance of this evidence does not alone create good cause in the absence of diligence to discover it during the discovery period.

### B.  Cross-Motions for Summary Judgment

The Cross-Motions for Summary Judgment should be denied because material facts are in dispute. In particular, the parties dispute whether Mr. Turley failed to disclose that he was using, and made plans to continue using, the Vessel for chartering, which could establish that Plaintiff

*intended* to use the Vessel for chartering at the time he applied for insurance coverage with Defendant.  (DE 31 at 3-4; DE 23 at 6).  Plaintiff argues that Mr. Turley did not misrepresent or fail to disclose a material fact regarding intent to charter the Vessel.  (DE 31 at 4).  Defendant argues that its underwriter would not have agreed to issue a policy had that underwriter known Mr. Turley's history of: seeking coverage to charter, intent to charter, or seeking to have coverage in the event he later decided to charter.  (DE 23 at 6).  The parties also dispute whether, if Mr. Turley had disclosed an intent to use the Vessel for charters or other excluded commercial purposes, Defendant would have issued the policy.  (DE 31 at 4; DE 23 at 6).

### 1.  Whether Turley Intended to Charter

The first issue regarding Mr. Turley's intent to charter the Vessel while covered under Defendant's policy cannot be resolved on the basis of the record because: (1) Mr. Turley's 2016-2018 tax returns specifically identified the Vessel as a "CHARTER BOAT"; (2) he reported revenue from the Vessel on his tax returns in 2016-2018; (3) Ms. Favita at Oversea, who assisted Mr. Turley with transitioning coverage from the prior insurer to Defendant, specifically inquired about his full-time captain and crew; and (4) the Vessel was advertised for charter during the period that Defendant insured it.[11]  While Mr. Turley denies that he chartered the Vessel, denies that the revenue reported on his tax return represents monies received for chartering the Vessel even though the Vessel was identified as being for charter on those tax returns, denies knowing why Ms. Favita at Oversea inquired about full-time staffing of the Vessel, and denies knowledge of, or involvement with, advertising the Vessel for charter, a reasonable fact finder could infer from these facts that Mr. Turley did charter the Vessel and did so more than occasionally.  If he did, in fact,

---

[11] Defendant's memorandum of law for its motion for summary judgment alleges that "Turley never took steps to discontinue or to interrupt the on-line advertisement showing his vessel as being available for charter."  (DE 23 at 2).

charter the Vessel during the three years prior to obtaining a policy from Defendant, and if the Vessel continued to be advertised for charter after Defendant issued its policy, then a reasonable inference could be drawn that Mr. Turley intended to charter the Vessel at the time he applied for coverage with Defendant and failed to disclose such intent.

Compounding the possible inferences as detailed above is the inference that may be drawn from Mr. Turley's testimony that he had thought about chartering the Vessel and that he believed he had coverage for chartering just in case he did charter, both before and after transitioning his insurance coverage to Defendant. While not dispositive on whether Mr. Turley intended to charter, it adds support to other inferences that may reasonably be drawn regarding whether Mr. Turley intended to use the Vessel for charter at the time of his application for insurance with Defendant.

Furthermore, whether or not Mr. Turley reported income or revenue from the Vessel in 2019 is not dispositive on the issue of whether Mr. Turley chartered the Vessel in 2019. Given that a reasonable juror could find that Mr. Turley lacked credibility on the issue of whether he chartered the Vessel in 2016-2018, a reasonable fact finder may also conclude that Mr. Turley simply failed to report chartering income for tax purposes in 2019, after chartering became an issue when the Vessel was declared a constructive loss for insurance purposes. Accordingly, given all the possible inferences from the record as described above, a finder of fact could reasonably find that Mr. Turley chartered the Vessel, and therefore intended to use the Vessel for chartering, both before and after Defendant insured the insurance policy.

On the other hand, because Defendant has not established conclusively that Mr. Turley *ever* chartered the vessel, much less during the policy period, the issue of Mr. Turley's intent regarding chartering at the time he applied is a matter of inference and credibility. Mr. Turley has denied having that intent, and while there may be sufficient facts for a fact finder to infer that he

had the intent to charter, a reasonable fact finder could infer the opposite as well.  Therefore, this issue remains in dispute, and this is a matter that must go to trial.

**2.   Whether an Intent to Charter Would Have Been Material**

The second issue of materiality – i.e. whether Defendant would have issued the policy even if Plaintiff disclosed an intent to use the Vessel for chartering – is tied to Plaintiff's arguments regarding the testimony of Defendant's underwriter, Mr. Ferch.  (DE 31 at 11-12).  Plaintiff first argues that, if Mr. Turley had checked off "yes" to "Captained Occasional or Occasional Charter Coverage" in the application indicating that he wanted charter coverage, Defendant would have still issued the policy.  Plaintiff reasons that Mr. Ferch would have asked about prior chartering specifics, and Mr. Turley would have signed a statement committing not to use the Vessel for chartering in the future.  *Id.* at 11, 14.

Plaintiff's argument is too speculative and attenuated to warrant summary judgment.  If Mr. Turley had requested charter coverage from Defendant, exactly what would have been asked or disclosed is unknown.  Furthermore, any assertion about what would have been disclosed is subject to a credibility assessment.

Plaintiff further argues that, even if Mr. Ferch had seen Mr. Turley's tax returns that reported income from the Vessel in 2016-2018, Mr. Ferch testified that he would simply have asked for additional information about prior use and would have had Mr. Turley sign a statement saying that he was not going to use the Vessel for charter purposes.  *Id.* at 11-12.

The entirety of Mr. Ferch's testimony, however, does not lend itself to this simple conclusion.  Plaintiff's counsel conducted a direct examination of Mr. Ferch on November 23, 2020 (DE 28-1 at 1), which included the following testimony by Mr. Ferch:

> Q:     During your tenure at [Defendant] from February 2018 to December 2019, did [Defendant] insure vessels in . . . [the] Florida region that provided

occasional chartering or captained chartering?

A:     The only chartering that the company was doing at that point was what we refer to as a "fishing six-pack charter."

. . .

Q:     No more than six passengers, no more than 25 charters a year?

A:     . . . correct.

Q:     And is that something that in your time with [Defendant] would be considered occasional chartering or captained occasional chartering?

A:     Correct.

. . .

Q:     [W]hen someone is applying for insurance and the general agent has these underwriting guidelines in front of them, there is nothing in here to indicate when you're applying for insurance that, you know, it's not acceptable or it's not okay if you're going to use the boat on occasion for a commercial purpose. Fair to say?

A:     Fair to say. . . . the application process at the general agent is all-inclusive of all the materials that they have to work with, which includes the policy itself. The guidelines are simply guidelines. They are not the be all, do all, end all to all decision-making. And we are still looking at a policy, which the general agent is going to be completely aware of before they even begin the process, which is a policy for private pleasure use only.

. . .

Q:     [W]hat would you, as an underwriter at [Defendant], consider to be "commercial purpose"?

A:     Well, I would go back to the policy itself relative to answering that question, which the policy is written for private pleasure use only. So, it answers the question in a different way, but I think is just as clear.

…

Q:     [F]or purposes of the underwriting guidelines and this application, the attestation of the applicant is saying, look, I agree, the yacht will not be used primarily for commercial purposes, correct?

A:     That is one of the attestations, correct.

Q:     Okay. Now, there is a difference between using the boat the boat on

occasion for a commercial purpose as opposed to using the boat for an occasional charter?

A:   Can you clarify that for me?  I'm not sure what you're trying to get at there, John.

Q:   Well, just, I guess, I'm trying to clarify what we've already established so I'm clear.

A:   Okay.

Q:   We've established that the phrase "primarily for commercial purposes" would allow for an occasional use of the vessel for a commercial purpose. So, my question is, how is that different from "occasional charter," if there is a difference? And I don't know if there is one, but if there is, I would like to know.

A:   Chartering would -- The occasional charter, which would be a coverage that attaches only when requested to be added to the policy, would be a subsection of something I would refer to as a "commercial" or "business use" of the boat. But it attaches only when it's attached by endorsement. It's not part of the policy without actually ask -- requesting the coverage and being charged for the coverage.

Q:   So, if I understand what you're saying, in order for an insured to use the boat once, twice, or on occasion for a commercial purpose, there has to be an endorsed coverage to the policy for occasional charter use?

A:   Well, again, I'm not going to have you put words in my mouth, John.  I'm going to refer back to my statements earlier, which is we can't pretend that the policy doesn't exist, and the policy does not allow for anything other than private pleasure use unless it's endorsed for the chartering.

. . .

Q:   I'm going to show you Question Number 7 in the answers to interrogatories and the answer . . . Had [Defendant] known that the Plaintiff . . . Mr. Turley, intended to occasionally charter the vessel when the insurance was applied for, identify the information and/or documentation that [Defendant] would have requested, if any, to determining whether or not to insure the vessel. Do you see that question?

A:   I do.

Q:   And the answer is this: Had the information been disclosed at the time of application, that being the intent to occasionally charter the vessel, had that information been disclosed in the application, the underwriter, which I

26

assume is you, Mr. Ferch, would have requested clarification regarding the prior business/chartering specifics and would have insisted on receiving a written statement advising that the prior situation had changed, and the vessel to be insured would no longer be chartered or used in any business or commercial capacity.  Do you see that?

A:     I do.

. . .

Q:     Had the prospective insured . . . been unwilling or unable to provide the written statement . . . the underwriter . . . would have rejected the risk and would have declined to issue any policy of insurance. . . .Is that a true statement?

A:     Yes.

Q:     . . . [I]f in the application . . . where there's [the] phrase "captained occasional or occasional charter coverage," instead of putting "no," if the "yes" box had been marked . . . [y]ou . . . would have first requested clarification regarding any prior business or chartering specifics, right? Correct?  Correct?

A:     . . . This question is being asked relative to the additional information that we had regarding prior chartering business. . . . The question that is . . . asked of me is, had I had that information at the time of the application . . . how would I have responded to it.

. . .

Q:     In the application that was submitted, instead of the "no" box being checked off for captained or occasional chartering, [assume] the "yes" box was checked off.  As the underwriter getting that application, what would you have done?

A:     Well, the problem I would have with a "yes" checked box in this particular application is the type of vessel.  This is a 65-foot V65 Viking motor yacht and not a vessel that I would readily see as any sort of a commercial charter fishing vessel. . . . [T]hat would open all sorts of questions from my side as to what kind of chartering are we really trying to do here.

Q:     Okay.  So, if we go back to your answer in Number 7 or [Defendant]'s answer, I should say, if that was the case, you would've requested basically additional information, clarification regarding the previous business and chartering specifics, right?

A:     That's correct.

Q:      And then you would have insisted on receiving a written statement advising that the prior situation had changed and the vessel to be insured would no longer be chartered or used in any business or commercial capacity, correct?

A:      Yes, but – . . . let me carry this out a little further for you, John. Again, here's the problem that we have in the middle of that change: The second part of that answer is based upon the additional information I have at the time of answering that question at that period in time versus what was presented to us simply as part of the application. So, when I – when I'm stating the second part of this, it's knowing that we have information that the vessel has been chartered previously.

Q:      Okay. And let's assume –

A:      And I'm assuming it's not fishing – it's not six-pack chartering.

Q:      Right. It's an occasional charter where the identified captain takes a few people out for a day and gets compensated. Okay?

A:      Correct. And under that set of circumstances, we would not write the policy.

Q:      Fair enough. And you would've insisted, as this answer says, on a statement from the applicant, Mr. Turley, that he would not use the vessel for those purposes, correct?

A:      That is correct.

. . .

Q:      So, it sounds like it was an either/or situation. If you give me the statement saying you're not going to use the boat for this purpose, I'll insure the boat. If you don't give me this statement, I'm not going to insure the boat. Fair to say?

A:      Fair to say.

Q:      What was different about this . . . [V]essel?

A:      First of all, we're dealing with a motor yacht and not a sport fishing boat. Second of all, with the information I've got, I've got information from 2016, 2017, 2018 showing revenue for the boat and revenue that's increasing. So, I have a pattern of increasing use of the boat for some sort of business or commercial use in a vessel that I'm – I'm reasonably assured of [sic] is not being chartered for six-pack fishing charter, but rather, for commercial

charter where we're just simply taking the boat out. We did not write that sort of charter for anybody at that time. It was only fishing charters.

Q:     Well, my question goes back to the time of the application. Okay? And at the time of the application, what you're saying or what [Defendant] is saying is that had the optional coverage of occasional chartering been checked "yes," I want this coverage, at that time, you would've asked for additional information about . . . prior charters or business use and required a statement that you can't do this for our policy. And I'm talking about now at the time of the application. And if Mr. Turley said, no, I'm not going to sign this statement, you would not have agreed to [issue] the policy, correct?

A:     Going back to the application . . . in that context . . . my concern would've been the type of vessel that we're insuring here is not one that we would traditionally look for for [sic] a six-pack charter fishing option. . . . Because of that, then I would've pursued the questions about what kind of chartering we're looking to do. . . . That is not a . . . boat that we would have been offering fishing charters for. Therefore, at the end of the day, we wouldn't offer any sort of chartering for the boat at all.

Q:     . . . [T]he additional questions you would've asked were to find out whether this was a boat that was used for fishing charters, six-packs, which would be okay under the program, as opposed to a yacht of this size being used to take passengers out for hire, which would not be okay . . .

A:     [T]his was not a traditional fishing-style boat and we're asking for chartering, and that's where the concern opens up.

Q:     . . . And because of that concern, you would have asked for additional information . . . such as what?

A:     Such as, what kind of chartering have you done in the past? What kind of chartering do you intend to do in the future?

Q:     . . . And depending on those answers, you would have done what?

A:      . . . he could say one of two things: He's using it for a non-fishing chartering situation, which we absolutely, positively would never do, regardless of the boat, or he would come back and tell me that he's six-pack fishing, and the underwriter in me would question the veracity of that answer and look for additional information to demonstrate that, in fact, any of that prior chartering or chartering that he would be doing, how is he set up for it? . . .

Q:     . . . In which case, you have asked him to sign a statement saying he's not going to use the boat for chartering purposes, correct?

29

A:      Correct. . . . I now need him to reassure me he's not going to continue on
        with it.

Q:      . . . [and] you would've agreed to accept the risk. . . .

A:      . . . under those set of circumstances, yes.

. . .

Q:      Under the policy, Mr. Ferch, business entertainment use of the vessel is
        permitted?

A:      Yes.

Q:      In other words, the owner can take out clients or prospective clients,
        correct?

A:      Correct.

Q:      Is the owner under those circumstances allowed to accept from the clients
        or prospective clients any money to cover the costs of the use of the vessel,
        such as fuel?

A:      Under a strict interpretation of the meaning of "commercial," the answer
        would be no.

Q:      Well, I'm talking about under the policy language of "business
        entertainment use," which is allowed.

A:      Again, having the knowledge of income coming in to the vessel of a
        commercial nature, which that would end up being if it's declared, that
        would raise some issues relative to whether that's appropriate.

. . .

Q:      [I]f one or more of the participants in the outing said, you know what, Tom,
        let me cover the cost of the fuel for today, for example, would that be okay
        – would that be a permitted use under the policy?  Would that be within the
        permitted use of business entertainment, sir, yes or no?

A:      I'm not going to offer a "yes" or "no."  I'm going to qualify the answer . . .
        because we're getting into an area that I consider claims as opposed to
        underwriting.  From an underwriting standpoint, I don't believe it fits the
        intent.  But whether that would create a potential coverage issue down the
        road, I'm unwilling to answer "yes" or "no."

Q:     . . . I'm asking you that, sir, as the underwriter.

A:     As the underwriter in that specific set of circumstances, were that business associate to be participating in the costs of the outing to the extent that it is simply covering some expenses, I don't believe that that would – would create a problem from an underwriting standpoint.

(DE 28-1 at 29:19-30:2; 31:2-8; 35:25-39:21; 41:14-43-5; 61:19-64:18; 65:13-67:15; 65:13-67:15; 69:2-8; 69:14-75:21; 77:20-78:13; 79:7-81:10).

First, an in-depth review of Mr. Ferch's testimony reveals that Mr. Ferch *speculated* that he would have provided Mr. Turley an opportunity to commit in writing to no further chartering of the vessel *if* Mr. Turley had acknowledged that the Vessel was, in fact, being used for passenger charters rather than fishing charters at the time of application. The inquiry itself asks Mr. Ferch to speculate about what additional information he would have sought in response to reviewing the 2016-2018 tax returns at the time of application and what answers Mr. Turley might have provided. Mr. Ferch did not have the tax returns in the first instance in order to make inquiry on that basis at the time Mr. Turley applied for the insurance policy. Nonetheless, Plaintiff's counsel requested that Mr. Ferch assume he had the tax returns and asked what Mr. Ferch would do as a result of the income reported from the Vessel, and it appears that Mr. Ferch assumed that Plaintiff would acknowledge chartering in a manner that Mr. Ferch found consistent with the type of Vessel under consideration—passenger chartering. What actually happened, however, is that Plaintiff did not disclose the tax returns, did not (and does not) acknowledge passenger chartering of the Vessel, and did not sign a statement committing not to further charter the Vessel. Thus, the hypothetical is too attenuated from what actually happened to provide a factual basis for concluding that Plaintiff's tax reporting of income from the Vessel would not have mattered for purposes of the insurance application. I find nothing in Mr. Ferch's testimony to conclude one way or the other whether disclosure of Mr. Turley's 2016-2018 tax returns would have resulted in Mr. Turley

31

simply signing a statement that he would no longer charter followed by Defendant's issuance of the policy.

Mr. Ferch's testimony does, however, reveal a strong desire by Defendant to not insure the risk of even occasional non-fishing chartering. Mr. Ferch adamantly explained that Defendant issued a policy for private pleasure. Mr. Ferch also explained that the Vessel was not of the type to engage in the only type of chartering that Defendant did endorse—occasional fishing charters. Further, Mr. Ferch made clear that Defendant did not provide *any* coverage or policy endorsements for, nor would he have accepted the risk for, "occasional chartering" – defined as an identified captain taking a few people out for a day and getting compensated. In fact, Mr. Ferch only begrudgingly acknowledged that a business associate *voluntarily* offering to cover costs of an outing would not preclude issuance of the policy. Mr. Ferch's testimony, however, begs the question as to how much of this kind of "volunteering" would be acceptable under the policy's provision for business entertainment use.

To the extent that Plaintiff argues that "occasional chartering" was allowed by the policy and that the disclosure of past occasional chartering activity was not a material fact that required disclosure, I find that Plaintiff's argument lacks merit. Mr. Ferch's testimony indicates that he would have considered knowledge of the income from the Vessel that Mr. Turley reported for tax purposes to be indicative of precluded commercial use. A reasonable juror reviewing Mr. Ferch's complete testimony could conclude that Defendant did not want to insure the risk of *any* "occasional chartering" and that evidence of prior chartering of the Vessel would be material, if known, to Defendant's decision to issue the policy.[12] Thus, I conclude that, contrary to Plaintiff's

---

[12] Given this, it would also be reasonable to infer that a person wishing to later claim that a vessel was insured for "occasional chartering" because it was "not primarily used for commercial purposes" would withhold information that it was being so chartered to avoid making a written commitment to not engage at all in this type of chartering moving forward.

position, disclosure of prior chartering, if it occurred, was material to Defendant's decision to issue the policy.

For the above reasons, Mr. Ferch's testimony does not support Plaintiff's position that, had Mr. Turley requested charter coverage or disclosed prior occasional chartering, Defendant would have issued the policy after obtaining a written commitment from Mr. Turley that he would not use the Vessel for chartering while Defendant insured the Vessel.  As previously discussed, how Mr. Turley would have answered further inquiries and how Mr. Ferch would have responded to Mr. Turley's answers is unknown.  Also, it is not plausible that Mr. Turley would have disclosed prior occasional chartering given his absolute denial of ever chartering.  Therefore, based on a complete review of Mr. Ferch's testimony, I cannot conclude that Mr. Ferch would have provided Mr. Turley an opportunity to commit in writing to no further chartering of the vessel if Mr. Ferch had had information that the Vessel was being used for occasional chartering at the time of application.

Second, had Mr. Ferch reviewed the 2016-2018 tax returns with their indication of prior charter income, it is reasonable to infer that Defendant would have denied coverage because Mr. Ferch's further inquiry could have led to him acquiring the Vessel's prior insurance information and declining the risk based upon a veracity determination.  Mr. Ferch stated that he could foresee a situation where he might have requested both the previous policy and the tax forms from Mr. Turley because there was not a standard set of questions that Mr. Ferch would ask, and the full extent of inquiry would depend upon the responses he received.  (DE 28-1 at 93:4-94:4).  Further, Mr. Ferch's testimony reveals that he assessed veracity in underwriting when he found reason to and, when finding it to be at issue, would decline to assume the risk.  Mr. Ferch testified, for example, that he would have had a veracity issue with Mr. Turley asking for charter coverage

33

while asserting that the Vessel was being used for fishing charters because, as he explained in his deposition, the Vessel was not the type to accommodate fishing charters.

As Mr. Ferch responded more explicitly during his cross-examination, he would have found Mr. Turley's veracity to be at issue and would have declined coverage if faced with both Mr. Turley's tax returns and prior policy information:

> Q:    [I]f you had this information [the tax returns] in May of 2019, how would that have impacted your judgment as an intelligent and reasonable underwriter?
>
> A"    Well, . . . I would've made the assumption at that point that because we had a revenue stream coming in to the vessel, it was in fact, being chartered in some form or fashion, and I would've proceeded in the same way that we have previously discussed, which is ask for additional information about what this is all about and pursue it from there.
>
> Q:    Have you seen any previous policies that Mr. Turley or [Plaintiff] had on this vessel for '16, '17, and '18?
>
> A:    As part of the investigation in the file, the prior policy with Tradewinds was presented.
>
> Q:    And do you know if the Tradewinds policy permitted chartering by Mr. Turley?
>
> A:    It did not.  In fact, the Tradewinds application has a question, "Is vessel used for commercial fishing or charter activities?"  The answer was, "No."
>
> Q:    Ooh.
>
> A:    And, in addition to that, the policy appeared to match what we offered, in that they did have a paid – one paid, full-time captain for the vessel.
>
> Q:    And if you had had in your possession – if you had had knowledge of the Tradewinds policy and that application, together with the fact that Mr. Turley had been chartering the vessel or at least was reporting income for chartering the vessel in '16, '17, and '18, how might that have impacted your judgment as a reasonable and intelligent underwriter? . . . The fact that he was chartering, and he's saying that he's not going to charter, and he's got a policy that doesn't permit chartering through Tradewinds, how would that have impacted your underwriting judgment, Mr. Ferch? . . .

A:      That presents to the underwriter a veracity problem, in that he had previously answered a question, in that the vessel is not being used for commercial fishing and chartering activities, and the documents that we've had suggest that that is an untrue statement.  As any reasonable underwriter would do at that point, I think that presents problems with the client itself, the risk itself, and would've likely precluded writing the policy.

(DE 28-1 at 87:6-89:8).  Therefore, it is certainly plausible that Mr. Ferch, upon receiving the 2016-2018 tax forms could have also obtained the prior policy information during the application process and denied writing the coverage based upon a finding that Mr. Turley's veracity was at issue.

Accordingly, I do not find Plaintiff's argument meritorious that Defendant would have issued the policy—if Mr. Turley had requested coverage for occasional chartering or if Defendant had received the tax return information for 2016-2018—by simply having Mr. Turley provide a written statement that chartering would not continue.  Rather, I find, while it is speculative as to what would have happened if Mr. Turley had requested coverage for chartering or had provided his 2016-2018 tax return information at the time of application for the insurance policy, it is plausible that Defendant could have denied coverage.

Furthermore, as discussed above, neither party has proven that Mr. Turley did or did not charter the Vessel either before or after Defendant issued the insurance policy, and neither party has proven whether or not Mr. Turley intended to use the Vessel for chartering at the time he applied for coverage with Defendant.  Plaintiff swears to have never used the Vessel for chartering and denies intending to charter at the time he applied for Defendant's insurance policy.  Defendant points to the Vessel being advertised for charter, a history of reporting income from the Vessel, and Mr. Turley's belief that he had coverage for occasional chartering, among other things, as evidence that Plaintiff intended to charter despite his testimony to the contrary.  Based upon the record, as previously explained, it is not possible to resolve the dispute regarding Plaintiff's intent

to charter at the time of his policy application using a summary judgment standard.  Thus, I find that there is a dispute of material fact at issue, which precludes a finding of summary judgment in favor of either party.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, I **RECOMMEND** that the Motions (DE 21; DE 31; DE 47) be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 12th day of February 2021.

**Jared M. Strauss**
**United States Magistrate Judge**

Copies furnished via CM/ECF to:

Hon. Rodolfo A. Ruiz, II
Counsel of record